26cr193 JNE/DTS

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>FAIZA OSMAN AHMED,<br>Defendant. | **INDICTMENT**<br>18 U.S.C. § 1347<br>18 U.S.C. § 2<br>18 U.S.C. § 982(a)(7)<br>21 U.S.C. § 853(p) |

**THE UNITED STATES GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment:

1. Medicaid was a health and long-term care coverage program jointly financed by states and the federal government pursuant to the Social Security Act of 1965 that provided benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services, was responsible for overseeing Medicaid in participating states, including Minnesota.

2. Individuals who received benefits under Medicaid were referred to as "recipients."

3. Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

SCANNED
OCT 27 2026 AR
U.S. DISTRICT COURT MPLS

4. Each state, including Minnesota, established and administered its own Medicaid program and determined the type, amount, duration, and scope of services covered within broad federal guidelines.

5. Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Service providers were authorized to submit claims to Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services were medically necessary, rendered to the patient as represented, and not rendered as a result of kickbacks or bribes.

6. In Minnesota, Medicaid was administered by the Minnesota Department of Human Services ("DHS").

7. Medicaid providers were required to meet certain requirements in order to participate in the Medicaid program, including billing and recordkeeping requirements. In Minnesota, these requirements were set forth in the Minnesota Health Care Programs ("MHCP") Provider Manual.

**A. Background on Minnesota's Individualized Home Supports ("IHS") Program**

8. In 2018, Minnesota began offering IHS as a new Medicaid benefit. IHS was designed to help people with disabilities live as independently as possible in the community.

9. According to DHS, the IHS Program permitted reimbursements for support and/or training for the following four categories: (1) community participation; (2) health, safety, and wellness; (3) household management; and (4) adaptive skills.

10. The IHS Program had the following requirements to enroll as a beneficiary: (1) live in their own home or their family's home; and (2) receive services through one of the following waivers: (a) brain injury; (b) community access for disability inclusion; (c) community alternative care; or (d) developmental disabilities.

11. To submit claims for reimbursement, a provider was required to submit the name of the beneficiary serviced, the type of billable service provided, and the number of hours worked.

12. IHS providers were required to maintain the following documentation of service delivery: (1) the date of the documentation; (2) the day, month, and year the service was provided; (3) the start and stop times with a.m. and p.m. designations (except for case management services); (4) service name or description; and (5) the name, signature, and title, if any, of the person providing the service. If more than one staff member provided the service, the provider was permitted to designate one staff member responsible for verifying services and completing the documentation required.

13. IHS services could not be provided or reimbursed while either the provider or recipient was outside the United States.

**B. Background on Minnesota's Personal Care Assistance ("PCA") Program**

14. Minnesota's PCA program covered four basic categories of service: (1) activities of daily living ("ADL"), which were activities a person needed to carry out

on a daily basis to remain healthy and safe; the covered ADLs were dressing, grooming, bathing, eating, positioning, transfers, and mobility; (2) instrumental ADLs, which were activities a person needed to carry out on a regular basis to remain independent (for example, shopping, paying bills, and meal preparation); (3) health-related procedures and tasks, which were tasks such as supporting a person with self-administered medications and helping with range of motion exercises; and (4) observation and redirection of behaviors, which involved monitoring a person's behaviors and redirecting them to more positive behaviors when needed.

15. To be eligible for the PCA Program, a person must have: (1) lived in the community and not a facility, such as a hospital or nursing home; (2) been able to direct care or have a representative who could direct care on their behalf; (3) been enrolled in one of Minnesota's health care programs (e.g., Medical Assistance, Alternative Care, and, for some people, Minnesota Care); and (4) had an assessment that determined they were eligible.

16. All PCA workers were required to meet minimum program requirements, be competent to meet the person's individual needs, be able to do the tasks in the care plan/service delivery plan, and be able to communicate with the person and their provider(s).

17. The minimum program requirements for all PCA workers were: (1) pass a background study; (2) pass a standardized training and tests; and (3) be enrolled with DHS and affiliated with a PCA agency.

18. PCA workers were required to document all time and activity they provided to each Medicaid recipient daily and had to include all of the following required components: (1) the provider agency / financial management services provider name and phone number; (2) information about person using services, including their name, MHCP identification number or date of birth, and dates and location of the person's stays in a hospital, care facility, or incarceration; (3) PCA worker name and Unique Minnesota Provider Identifier; (4) day, month, and year of each service, in consecutive order; (5) arrival and departure times of each visit, including a.m. and p.m. notations; (6) staff-to-person ratio and location of visit (if serving people using shared services; (7) all covered personal care services provided; (8) total time for each shift; (9) the following anti-fraud statement: "I declare under penalty of perjury that all hours worked and descriptions of work performed contained in the submitted shifts are true and correct with full knowledge that all of this information may be subject to investigation and that any false or dishonest information contained on these shifts may be grounds for denial of payment and/or reporting of findings to the investigation unit of the Department of Human Services"; (10) signature of the worker after they complete all other fields; (11) signature of the person receiving services or their representative after they review the completed time and activity documentation for accuracy; and (12) date(s) the form is signed by each party.

19. PCA providers were reimbursed based on units of service, in 15-minute increments, that were required to be provided in a one-on-one setting and could not be provided remotely.

20. PCA services could not be provided or reimbursed while either the provider or recipient was outside the United States.

## C. Background on Minnesota's Night Supervision Services Program

21. The Night Supervision Services Program ("Night Supervision") was intended to provide overnight assistance and supervision by staff in the person's own home when the person has an assessed need in one of the following areas: implementation of the person's positive support programming and transition plans; reinforcement of skill development supports; assistance with ADLs; assistance with instrumental ADLs.

22. Night Supervision providers were required to maintain the following documentation of service delivery: (1) the date of the documentation; (2) the day, month, and year the service was provided; (3) the start and stop times with a.m. and p.m. designations (except for case management services); (4) service name or description; and (5) the name, signature, and title, if any, of the person providing the service. If more than one staff member provided the service, the provider was permitted to designate one staff member responsible for verifying services and completing the documentation required.

23. Night Supervision providers were reimbursed based on units of service, in 15-minute increments, that were required to be provided in a one-on-one setting and could not be provided remotely.

24. Night Supervision services could not be provided or reimbursed while either the provider or recipient was outside the United States.

**D. Defendant and Relevant Entity**

25. FAIZA OSMAN AHMED was a resident of Hennepin County, Minnesota, at all times relevant to this Indictment.

26. HOME SWEET HOME HEALTH CARE LLC ("HSHHC") was registered as a business entity with the Minnesota Secretary of State in or around February 2016, identifying FAIZA OSMAN AHMED as the sole organizer.

27. In or around May 2016, FAIZA OSMAN AHMED enrolled HSHHC with DHS for the purpose of being permitted to submit claims to the Minnesota Medicaid programs, which eventually included IHS, PCA, and Night Supervision.

28. From in or before November 2021, and continuing through at least March 2026, FAIZA OSMAN AHMED submitted claims to Minnesota Medicaid for purportedly providing IHS, PCA, and Night Supervision services.

29. From in or before November 2021, and continuing through at least March 2026, FAIZA OSMAN AHMED controlled the operation of HSHHC, including the submission of claims to Minnesota Medicaid.

**E. The Scheme to Defraud Medicaid**

30. From in or before November 2021 through in or around at least March 2026, in the District of Minnesota and elsewhere, defendant FAIZA OSMAN AHMED did knowingly devise and participate in a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by,

and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

31. It was the purpose of the scheme for FAIZA OSMAN AHMED to unlawfully enrich herself, by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicaid (i) that inflated the number of hours of IHS, PCA, and Night Supervision services actually provided, and (ii) for IHS, PCA, and Night Supervision services that were not actually provided; (b) concealing the submission of false and fraudulent claims to Medicaid and the receipt and transfer of proceeds of the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of FAIZA OSMAN AHMED and others, and to further the fraud scheme.

32. The manner and means by which FAIZA OSMAN AHMED executed the scheme included, among other things, the following:

a. FAIZA OSMAN AHMED registered HSHHC with the Minnesota Secretary of State in or around February 2016 and identified herself as the company organizer.

b. In or around March 2016, FAIZA OSMAN AHMED submitted a Disclosure of Ownership and Control of Interest of an Entity application to DHS identifying herself as the 100% owner of HSHHC.

c. In or around May 2016, FAIZA OSMAN AHMED submitted a Provider Agreement to DHS, which she signed promising to "[a]ssume full responsibility for the accuracy of claims submitted to DHS," "[m]aintain records that fully disclose the extent of services provided … for a period of five

years," and "[r]efund any overpayments made to [HSHHC] by DHS, including those resulting from … billing errors [and] fraudulent billing."

d. In or around March 2016, FAIZA OSMAN AHMED opened Bank Account 1, held in the name of HSHHC, for which she was the sole signatory.

e. From in or before November 2021 through at least March 2026, Bank Account 1 received reimbursements from Medicaid for IHS, PCA, and Night Supervision services purportedly provided by HSHHC beginning in at least November 2021.

f. From in or before November 2021 through at least March 2026, FAIZA OSMAN AHMED was responsible for the submission of claims to Medicaid for IHS, PCA, and Night Supervision services purportedly provided by HSHHC to Medicaid recipients during that time period.

g. From in or before November 2021 through at least March 2026, FAIZA OSMAN AHMED knowingly and willfully submitted and caused the submission of claims to Medicaid for (i) more IHS, PCA, and Night Supervision services than HSHHC provided to Medicaid recipients, and (ii) IHS, PCA, and Night Supervision services that HSHHC did not provide.

h. FAIZA OSMAN AHMED, by and through HSHHC, knowingly and willfully submitted and caused the submission of claims to Medicaid for IHS, PCA, and Night Supervision services purportedly provided during periods of time when providers were actually working for other employers, were outside

the country, or were documented as providing services to other recipients at the same time.

i. FAIZA OSMAN AHMED, by and through HSHHC, knowingly and willfully submitted and caused the submission of claims to Medicaid for IHS, PCA, and Night Supervision services identifying providers who did not actually provide the billed-for services.

j. FAIZA OSMAN AHMED, by and through HSHHC, knowingly and willfully submitted and caused the submission of claims to Medicaid for IHS, PCA, and Night Supervision services for which HSHHC did not have legitimate documentation to justify claims for the billed for services, in violation of Medicaid rules and regulations.

k. In furtherance of the scheme, FAIZA OSMAN AHMED entered hours on behalf of providers as if entered by the providers to justify claims AHMED submitted by and through HSHHC for services that were not actually rendered.

l. From in or around November 2021 through in or around March 2026, FAIZA OSMAN AHMED, through HSHHC, billed Minnesota Medicaid approximately $10 million for IHS, PCA, and Night Supervision services purportedly provided to Medicaid recipients. AHMED, through HSHHC, was reimbursed approximately $8 million based on these claims, a significant part of which were false and fraudulent.

**Counts 1 through 6**
(Health Care Fraud; Aiding and Abetting)

33. Paragraphs 1 through 32 of this Indictment are re-alleged and incorporated herein.

34. In the District of Minnesota and elsewhere, FAIZA OSMAN AHMED , through HSHHC, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicaid, in connection with the delivery of, and payment for, health care benefits, items, and services, by causing the submission of the following false and fraudulent claims to Minnesota Medicaid for IHS, PCA, and Night Supervision services purportedly provided on or about the dates set forth below:

| Count | Medicaid Recipient | Medicaid Claim Number | Date of Billed Service | Approx. Amount Billed |
|---|---|---|---|---|
| 1 | R.C. | 92205400400012407 | 2/20/2022 | $112.70 |
| 2 | A.L. | 42518900924263936 | 2/7/2025 | $198.72 |
| 3 | A.L. | 42530800908203969 | 2/19/2025 | $198.72 |
| 4 | A.L. | 92514900400010199 | 5/14/2025 | $275.25 |
| 5 | A.L. | 92517600400006430 | 6/23/2025 | $330.30 |
| 6 | A.L. | 92524600400042056 | 8/20/2025 | $287.20 |

(Title 18, United States Code, Sections 1347 and 2.)

**FORFEITURE ALLEGATIONS**
**(18 U.S.C. § 982(b)(1), 18 U.S.C. § 982(a)(7))**

35. The allegations contained in Counts 1 through 6 of this Indictment are incorporated by reference as if set forth fully herein for the purpose of alleging forfeiture against defendant FAIZA OSMAN AHMED pursuant to the provisions of Title 18, United States Code, Section 982.

36. Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crimes charged in Counts 1 through 6 of this Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

37. If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

UNITED STATES ATTORNEY

FOREPERSON

COLIN M. MCDONALD
Assistant Attorney General
National Fraud Enforcement Division
U.S. Department of Justice